WO                                                                    MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Edward Lee Jones, Sr.,                        No.   CV 18-04872-PHX-MTL (JZB)

                    Plaintiff,

v.                                            **ORDER**

N. Wood, et al.,

                    Defendants.

Plaintiff Edward Lee Jones, Sr., who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, Special Management Unit (SMU) I, brought this civil rights action pursuant to 42 U.S.C. § 1983.  Defendants move for summary judgment (Doc. 102), and Plaintiff opposes (Docs. 127, 129, 130, 131).[1]

**I.    Background**

On screening of Plaintiff's First Amended Complaint (Doc. 31) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment retaliation claims in Count One against Correctional Officer (CO) III N. Wood, in Count Two against CO II Loreto, and in Count Four against CO III Garcia, a Fourteenth Amendment due process claim against Garcia in Count Four, and a Fourteenth Amendment due process claim against CO III Rothlisberger in Count Five.  (Doc. 32.)  The Court dismissed the remaining

─────────────────────

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 107.)

1    claims and Defendants.  (*Id.*)  Defendant Rothlisberger was subsequently dismissed for

2    failure to serve.  (Doc. 71.)

3    **II.    Summary Judgment Standard**

4          A court must grant summary judgment "if the movant shows that there is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6    Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

7    movant bears the initial responsibility of presenting the basis for its motion and identifying

8    those portions of the record, together with affidavits, if any, that it believes demonstrate

9    the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

10         If the movant fails to carry its initial burden of production, the nonmovant need not

11   produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

12   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

13   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

14   contention is material, i.e., a fact that might affect the outcome of the suit under the

15   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

16   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

17   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

18   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

19   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

20   it must "come forward with specific facts showing that there is a genuine issue for trial."

21   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

22   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

23         At summary judgment, the judge's function is not to weigh the evidence and

24   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

25   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

26   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

27   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

28

### III.   Retaliation

#### A.   Legal Standard

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a [government] actor took some adverse action against an inmate (2) because of (3) that inmate's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

#### B.   Count One (Defendant Wood)

##### 1.   Relevant Facts[2]

On April 6, 2018, CO III Wood was Plaintiff's assigned CO III, and part of her job was to assist prisoners with things such as legal calls and purchase orders. (Doc. 103 (Defs.' Statement of Facts) ¶ 17.) That day was a Friday, and Plaintiff went to Wood's office and asked to fill out and submit an external money order to purchase books. (*Id.*

---

[2] In Response to Defendants' Motion and Statement of Facts, Plaintiff filed a 265-paragraph Declaration and Exhibits totaling 572 pages (Doc. 127), a 20-page Statement of Facts in Opposition to Defendants' Statement of Facts and Motion for Summary Judgment (Doc. 129), an 18-page Statement of Disputed Facts in Opposition to Defendants' Statement of Facts and Motion for Summary Judgment (Doc. 130), and a 44-page Memorandum of Law in Support of Plaintiff's Statement of Facts in Opposition to Defendants' Statement of Facts/Motion for Summary Judgment (Doc. 131). Defendants argue in their Reply that Plaintiff failed to comply with Local Rule 56.1 because he failed to line-up his factual assertions with Defendants' Statement of Facts, and they ask the Court to deem their Statement of Facts as unopposed based on this failure and Plaintiff's obligation to "submit evidence responsibly." (Doc. 132 at 2.) Plaintiff, though, did say which of Defendants' facts he disputes in his Statement of Disputed Facts in Opposition to Defendants' Statement of Facts (Doc. 130), and it is sufficiently clear to the Court which facts are disputed. Also, as stated above, the Court can consider only those asserted facts that are properly supported by materials cited to in the record, and this requirement applies even if Plaintiff does not dispute an asserted fact. *See* Rule 56(c)(1)(A); *Nissan Fire*, 210 F.3d at 1103 (if the party moving for summary judgment does not meet its initial burden of production, the nonmovant need not respond; "[n]o defense to an insufficient showing is required") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970)). Further, because Plaintiff is proceeding pro se, the Court must avoid applying summary judgment rules strictly. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). The Court therefore declines to deem Defendants' facts unopposed.

¶ 18.)  Wood told Plaintiff that he would have to return during her open office hours to do that; Wood's office hours were on Tuesdays and Thursdays.[3]  (*Id*. ¶ 19.)

On Monday April 9, 2018, Plaintiff shouted at Wood while she was approaching Dorm 5 in South unit and insisted that she help him with the external money order.  (*Id.* ¶ 20.)  Wood again explained that such business would be conducted during open office hours (i.e., the next day).  (*Id.*)  Plaintiff then described to Wood her interactions with other prisoners that day, indicating that he had been continuously watching her for an extended period of time.  (*Id*. ¶ 21.)  It is detrimental to the safe and secure operations of the prison for a prisoner to continuously watch an officer for such a length of time.  (*Id*.)

On April 10, 2018, Defendant Wood authored disciplinary report number 18-A02-0223, citing Plaintiff for a 29B violation for stalking, a major violation.  (*Id.* ¶ 16.)  Captain Curtis heard the stalking charge and found Plaintiff guilty of a lesser charge of 07B, harassment.  (*Id*. ¶ 22.)  Plaintiff appealed, but the decision was upheld at each level and resulted in Plaintiff losing 15 days of earned release credits and other sanctions.  (*Id*.)

Plaintiff wrote an Inmate Informal Complaint Resolution alleging that Wood retaliated against him.  (*Id.* ¶ 23.)  Plaintiff dated the Informal Complaint April 9, 2018, but it referenced the disciplinary report for stalking, which was not issued until April 10, 2018.  (*Id*.)

Plaintiff sets forth the following facts in his Declaration with respect to his interactions with Wood.  Plaintiff's first interaction with Defendant Wood was on March 2, 2018, when she was instructed to facilitate Plaintiff's legal call.  (Doc. 127 at 22.)  On March 8, 2018, Defendant Wood pulled Plaintiff out of the dorm to discuss the informal complaints Plaintiff had submitted, and at the end of the conversation, she asked whether Plaintiff would be submitting complaints every week.  (*Id*. at 23.)  Plaintiff said, "if there is a problem every week, then yes."  (*Id*.)

---

[3] Because Plaintiff disputes many of Defendants' facts, the Court will not note each dispute but will set forth Plaintiff's version of events separately from Defendants' version.

On March 19, 2018, Wood asked Plaintiff to accompany her to another office to make copies of her responses to his informal complaints.  (*Id*.)  While making copies, Wood told Plaintiff she did not want to work for ADC but was forced to by her husband and when she reached the 25 year mark should wanted to go back to school to become a youth counselor.[4]  (*Id*.)  Wood then abruptly asked Plaintiff if he knew her husband.  (*Id*.)  Plaintiff acted as if he did not know her husband, even though Wood's husband also worked for ADCRR and Plaintiff had filed a civil rights lawsuit against him in May 2017.  (Doc. 31 at 7-8.)

On March 27, 2018, Plaintiff filled out a Declaration of Islamic Burial Arrangements and tried to give it to Wood to put in his AIMS file. (Doc. 127 at 24.)  Wood responded by giving Plaintiff "the 3rd degree" and asking why he "was attempting to reinvent the wheel." (*Id*.)  Plaintiff explained that he had seen a prisoner die and be left on the ground in a black trash bag for 8 hours, and Plaintiff asked what the problem was with his Declaration of Islamic Burial Arrangement.  (*Id*.)  Wood became frustrated and asked CO III Bell to assist her in explaining to Plaintiff "because she just knew [Plaintiff] was going to submit an informal complaint against her about [his] document." (*Id*.)  Plaintiff took back his document and to avoid saying anything disrespectful, he left their office and told Wood to forget about it.  (*Id*.)

On April 6, 2018, Plaintiff wrote an order for the purchase of religious books and took his order to Wood, explaining to her that he needed to re-order his religious books because the first order never arrived.  (*Id*. at 25.)  Wood responded sarcastically that she heard Plaintiff received his books on March 22, 2018.  (*Id*.)  Plaintiff explained that those books were from a different publisher and he was only looking to fill out an External Inmate Money Withdrawal Form.  (*Id*.)  Wood looked at her clock and her body language indicated she did not have the time and so Plaintiff suggested he could return on Monday, if she wanted.  (*Id*.)  Wood appeared relieved and said, "yeah, come back next week." (*Id*.)

---

[4] ADC stands for Arizona Department of Corrections.  The institution now goes by the name Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR).

Wood never said anything about returning on Tuesday or during "open hours," and if she had, Plaintiff would have returned on Tuesday, but he inferred she agreed to Monday. (*Id.* at 37.)

On Monday April 9, 2018, it appeared to Plaintiff that CO IIIs were available to assist prisoners because their gate was open and so he picked up his book order form to take to Wood's office. (*Id.* at 26.) As he was heading to Wood's office, he saw a prisoner leaving the gate with Defendant Wood trailing behind him. (*Id.*) When Wood saw Plaintiff approaching, she quickly closed and locked the gate, rushed back into her office, and shut the door. (*Id.*) Plaintiff felt insulted but walked away and returned his order form to his dorm. (*Id.*) Plaintiff then went to socialize with other prisoners at a table normally occupied by Black prisoners and as he sat there, he saw a white prisoner get up from a nearby table and walk to the CO III's gate and call Defendant Wood, who "stepped out and accommodated his request for an inmate account print out." (*Id.*) Seeing that, Plaintiff rushed back to his dorm to get his order form but when he returned, Wood had already returned to the office and closed the door. (*Id.*) About 30 minutes later, Plaintiff saw Wood heading toward the yard office and so he started to walk in her direction and called to her, but after the third time, he realized he was being "intentionally ignored and walked off." (*Id.* at 27.)

Later, Plaintiff saw Wood walking in his direction, and he asked Wood when he would be able to send out his book order and she said. "during her open hours," indirectly telling Plaintiff to return on Tuesday. (*Id.*) Plaintiff was frustrated and felt Wood was being vindictive and he told her that they had already agreed on Friday that he would return on Monday and she knew the importance of Plaintiff getting his book order mailed because of Ramadan time constraints. (*Id.* at 28.) Plaintiff pointed out to Wood that she had seen him earlier that morning and intentionally ignored Plaintiff, that she had no problem conducting business with individuals who walked up to her office, especially white prisoners, and "it was bullshit for her to suddenly enforce her office hours" when Plaintiff needed something done. (*Id.*) Wood tried to continue the conversation, but Plaintiff

walked off.  (*Id.*)  Plaintiff returned to his dorm and initiated an informal complaint against Wood.  (*Id.*)

Plaintiff then contacted CO IV Francisco and explained his issues with Defendant Wood, specifically, his problem obtaining a money withdrawal form to purchase his religious books, and he explained he felt discriminated against and was being given the run around by Wood.  (*Id.* at 29.)  Plaintiff told Francisco he had already started an informal complaint against Wood because she was retaliating on behalf of her husband, who Plaintiff was suing.  (*Id.*)  Francisco responded that she was unaware of any lawsuit, that Wood had said something about Plaintiff following Wood around and from the sounds of it, Wood may be issuing Plaintiff a disciplinary infraction for stalking.  (*Id.*)  Plaintiff returned to his yard and did not finish writing his informal complaint against Wood until after the yard closed.  (*Id.* at 30.)  Plaintiff added to his informal complaint: "And then issuing me a disciplinary report for stalking when I insisted she provide me with assistance in processing documentation necessary to purchase religious books." (*Id.* at 30.)  Plaintiff signed and dated the informal complaint on April 9, 2018.  (*Id.*)

The next morning, CO II Mueller told Plaintiff that he was being placed on report, but Mueller did not know why.  (*Id.*)  Plaintiff immediately went to talk to CO IV Francisco who told Plaintiff that Wood said he was following her around and became aggressive when Wood told Plaintiff to return during her open hours and she was going to place Plaintiff on report for stalking.  (*Id.* at 30-31.)  Plaintiff told Francisco what had happened in trying to get his money withdrawal form, that Wood was not being truthful, and she was looking for a way to further her retaliation and to cover up her unprofessionalism.  (*Id.* at 31.)  Plaintiff then went to his dorm to get his informal complaint, made copies, and put a copy in Wood's slot box, and turned in copies for DW Stickley, Division Director McWilliam, and sent the original to Francisco.  (*Id.*)  This happened at approximately 8:30 a.m. on April 10, 2018.  (*Id.*)

Plaintiff's Informal Complaint recounts the events between April 6 and 9, 2018 and states that Wood's refusal to assist him "was motivated out of evil intent to retaliate to my

1   civil rights complaint pled against [illegible] Wood (her husband) currently before the U.S.

2   District Court (CV-17-01547-PHX-DJH)" and that Wood issued him a disciplinary report

3   for stalking when Plaintiff insisted she provide assistance in processing his documentation

4   to purchase religious books.  (Doc. 127-3 at 23.)  CO IV Francisco responded to Plaintiff's

5   Informal Complaint, asserting that Wood used a professional management technique that

6   allowed her to manage her caseload work and appointments as well as walk in issues.  (*Id.*

7   at 25.)  However, Francisco said he verified that Plaintiff did name Wood's husband in a

8   pending lawsuit and so Francisco reassigned Plaintiff to another CO III "to ensure you do

9   not feel that your assigned COIII has a conflict of interest when working with you."  (*Id.*)

10                    **2.      Discussion**

11          Plaintiff alleges in Count One that Defendant Wood retaliated against him by filing

12   an unfounded disciplinary report for stalking after Plaintiff filed an informal complaint

13   against Wood.

14          It is undisputed that Wood took adverse action against Plaintiff by issuing him a

15   disciplinary report for stalking, which resulted in Plaintiff being found guilty of a lesser

16   charge of harassment, for which Plaintiff lost 15 days of earned release credits.  *See Rhodes*,

17   408 F.3d at 568 (arbitrary confiscation and destruction of property, initiation of a prison

18   transfer, and assault in retaliation for filing grievances was sufficient to plead an adverse

19   action); *Stevenson v. Harmon*, Civil No. 07-CV-1619 W (NLS), 2009 WL 10700432, at *4

20   (S.D. Cal. July 39, 2009) (the issuance of violations reports against the prisoner, which

21   resulted in loss of good time credits, constituted an adverse action).  And there is no dispute

22   that Plaintiff engaged in protected conduct by filing an Informal Complaint against Wood

23   for not helping him with his purchase order when he wanted her to.  *See Watison v. Carter*,

24   668 F.3d 1108, 1114 (9th Cir. 2012) ("Prisoners have a First Amendment right to file

25   grievances against prison officials and to be free from retaliation for doing so."); *Rhodes*,

26   408 F.3d at 567; *Hines*, 108 F.3d at 267 (prisoner may not be retaliated against for use of

27   grievance system); *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) (prisoner may not

28   be penalized for exercising the right of redress of grievances).  The issue then is whether

Wood took that adverse action because of Plaintiff's protected conduct.  The evidence does not support that Wood issued the disciplinary report for stalking in response to Plaintiff filing his Informal Complaint against her because Plaintiff filed his Informal Complaint *after* the disciplinary report was issued.  Even if Plaintiff started his Informal Complaint the day before Wood issued the disciplinary report, Plaintiff's own evidence supports that Wood was planning to issue a disciplinary report for stalking before Plaintiff had started writing his Informal Complaint.

Plaintiff, though, has presented evidence, including in his verified Complaint and in his Informal Complaint, that he engaged in protected conduct prior to receiving the disciplinary report from Wood by filing a lawsuit against ADCRR officials, including Wood's husband.  The issue then is whether Plaintiff's exercise of his First Amendment right to file a lawsuit was a substantial or motivating factor behind Wood's conduct.

To show that his protected conduct was a substantial or motivating factor behind Wood's conduct, Plaintiff may offer either direct evidence of retaliatory motive or evidence that the defendant knew of the protected conduct along with at least one of three general types of circumstantial evidence: (1) proximity in time between the protected conduct and the alleged retaliation, (2) that the defendant expressed opposition to the protected conduct, or (3) that the reasons proffered by the defendant for the adverse action were false and pretextual.  *McCollum v. California Dep't of Corrs. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (citation omitted); *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009); *see Pinard*, 467 F.3d at 771 n.21 (a plaintiff may establish a retaliatory motive by showing that the defendant knew of the protected speech and that there was "proximity in time between the protected speech and the allegedly retaliatory [action]").

Plaintiff stated that on March 18, 2018, while Wood was making copies and talking to Plaintiff about her job, she said that her husband made her work for ADCRR and she asked Plaintiff if he knew her husband.  Plaintiff does not say that Wood said anything else about her husband or that Wood ever mentioned Plaintiff's lawsuit in which Wood's husband was a defendant.  Because this evidence does not show direct evidence of a

retaliatory motive, Plaintiff must show that Defendant Wood actually knew about Plaintiff's lawsuit against her husband along with one of the types of circumstantial evidence.  The evidence does not support that Wood knew about the lawsuit.  But even if Wood was aware of the lawsuit against her husband and even if a reasonable jury could find that Wood was motivated, in part, by retaliatory animus when she wrote Plaintiff up for "stalking," this finding would not establish a First Amendment violation where the undisputed evidence shows that Wood also had a legitimate security-based reason for issuing the disciplinary report.  "[A]ction colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  To support a retaliation claim, the adverse action must be one that would not have happened "but for" retaliatory animus.  (*Id.*)  Here, Plaintiff's own evidence shows that he was watching Wood's actions closely, yelled out to her multiple times, and later confronted her about why she was not assisting him when he saw her assisting other prisoners, and then Plaintiff walked away from Wood when she was talking to him.  This evidence supports that the disciplinary report had some justification and, although the charge was reduced to harassment, it was upheld at all levels of appeal.  Accordingly, Plaintiff has failed to show that he would not have received a disciplinary report "but for" his protected conduct, and his retaliation claim against Wood fails.  The Court will grant summary judgment to Wood as to the retaliation claim in Count One.

### B.    Count Two (Defendant Loreto)

#### 1.    Relevant Facts[5]

Defendant Loreto was a CO II whose regular post was at ASPC-Douglas-Mohave. (Doc. 103 ¶ 4.)  However, on March 2, 2018, Loreto was working at ASPC-Florence-South, a sex offender yard where Plaintiff was residing.  (*Id.*)  Plaintiff told Loreto that he had a legal call scheduled that day, asked Loreto where he usually worked and whether Mohave unit was a sex offender yard.  (*Id.* ¶ 5.)  Legal calls are ordinarily facilitated by a prisoner's

---

[5] Again, because Plaintiff disputes many of Defendants' facts, the Court will separately set forth each version of events.

caseworker, a CO III, and it was not CO II Loreto's responsibility to facilitate legal calls. (*Id.* ¶ 6.)  Plaintiff told Loreto that his caseworker was not working that day, and Loreto said he would contact his Sergeant for advice on how to facilitate the legal call.  (*Id.* ¶ 7.)

As a CO II, Loreto was supposed to conduct random, unannounced searches every shift, and later that day, Loreto conducted a random cell search of Plaintiff's and two other prisoners' living areas.  (Doc. 103 ¶¶ 8-9.)  Loreto conducted the search to comply with ADCRR policy and to ensure the safe and secure operation of the prison; Loreto did not perform the search to retaliate against Plaintiff or for any improper purpose.  (*Id.* ¶ 10.) During the search, Plaintiff demanded to see a supervisor and Loreto agreed to call a Sergeant as soon as the search was complete, but Plaintiff walked off on his own, ostensibly to find a yard officer.  (*Id.* ¶ 11.)  Prisoners are not free to come and go during searches, and the building is on temporary lock-down to ensure the integrity of the search.  (*Id.* ¶ 12.) Loreto gave Plaintiff several clear directives not to leave the building, but Plaintiff walked off anyway, and Loreto radioed the Sergeant to place Plaintiff on report for refusing verbal directives.  (*Id.* ¶ 13.)

Loreto issued disciplinary report number 18-A02-0127 to Plaintiff for a "25B" violation for refusing to obey verbal directives.  (*Id.* ¶ 3.)  Disciplinary Coordinator Defeo issued a reprimand to Plaintiff based on disciplinary report 18-A-02-0127 and the testimony of the Sergeant.  (*Id.* ¶ 15.)  Plaintiff appealed the finding, but the appeal was denied.  (*Id.*)

Plaintiff presents a different account of what happened on March 2, 2018 and asserts the following.  Around 7:40 or 7:50 a.m., Plaintiff asked Loreto to contact appropriate unit staff about his legal mail and legal call.  (Doc 130 ¶ 6.) Plaintiff had a scheduled court hearing by telephone that morning and his CO III had told Plaintiff on March 1 that he would not be working on March 2 and that Plaintiff needed to contact his dorm officer to find out who would facilitate the legal call.  (Doc. 127 at 11.)  So, on March 2, Plaintiff went to the control room window where Defendant Loreto was working and "respectfully asked him to contact the appropriate unit staff" to pick up Plaintiff's legal mail and find

out who would facilitate Plaintiff's legal call because his assigned CO III was not in.  (*Id*. at 11-12.)  Plaintiff never asked Loreto what unit he was from or if it was a sex offender yard, and Loreto never said he would check with the sergeant on duty regarding Plaintiff's legal call.  (*Id*. at 22.)  Instead of contacting the appropriate staff, Loreto said, "If a Sergeant don't call for you, then you don't get your legal call."  (*Id*.)  Plaintiff was taken aback and informed Loreto that his legal call was court ordered and that sergeants do not facilitate legal calls, only CO IIIs or CO IVs.  (*Id*.)  Loreto then became argumentative and said he had worked for the ADCRR for 15 years and knew how things were done, and that he was from a general population unit, not a sex offender unit.  (*Id*.)  Plaintiff found Loreto's statement offensive and "questioned his insinuation" and before Loreto could reply, Plaintiff explained that neither law nor policy changed on the basis of a prisoner's classification or whether the prisoner was on a general population or sex offender unit.  (*Id*. at 13.)  Loreto responded in a sarcastic, "well everybody is G.P.," at which point Plaintiff told Loreto he longer wanted to continue having a conversation with him "because of his discriminatory state of mind."  (*Id*.)  Loreto then said he was doing the prisoners a favor by allowing them to smoke outside the dorm and Plaintiff and the other prisoners told Loreto that they were allowed to walk to chow and smoke their cigarettes.  (*Id*.)  Loreto became visibly upset and told them they could not and demanded that they "take it inside the dorm."  (*Id*. at 13-14.)

About five minutes later, Loreto entered Plaintiff's dorm and walked straight to Plaintiff's bunk area and asked Plaintiff where his property boxes were, stating that he only wanted to search Plaintiff's property.  (Doc. 127 at 14.)  Plaintiff never became upset but told Loreto that he knew Loreto's "conduct was retaliatory."  (*Id*.)  When Loreto "came up empty" from the search, he tried to take Plaintiff's fan, even after Plaintiff provided Loreto with proof of purchase/ownership.  (*Id*.)  At the start of the search, Plaintiff requested that Loreto contact a supervisor in order to resolve the issue at the lowest level "because the search was in retaliation/in violation of Department Order (DO) 708.1.0.," which governs searches, and because Loreto was trying to take Plaintiff's property unjustly.  (*Id*.)  After

Loreto refused a second time to call a sergeant, Plaintiff left the dorm, while Loreto "continued his desperate search to find some contraband in [Plaintiff's] property boxes." (*Id.*) Loreto did not realize that Plaintiff had left the dorm until after Plaintiff made contact with a sergeant and, in an attempt to conceal his misconduct, Loreto radioed the sergeant and asked him to place Plaintiff on disciplinary report. (*Id.* at 15.) Plaintiff felt unheard by that sergeant and ended the conversation and started walking back to his dorm when he saw Sergeants Thompson and Knight walking in that direction and Plaintiff explained the situation to them. (*Id.* at 16.) Knight tried to "incite and provoke" Plaintiff by making unnecessary comments, and after that CO III Defeo approached and made provoking comments, asserting that he would find Plaintiff guilty the next day. (*Id.*)

Defendant Loreto wrote the "disciplinary infraction under false statements," but after reviewing the facts, Disciplinary Coordinator CO III Defeo dropped the infraction to the lowest form of violation (a misdemeanor) and issued Plaintiff a verbal reprimand. (*Id.* at 17.) Plaintiff nevertheless appealed "because no directive was ever given by Defendant Loreto on March 2, 2018" and Loreto never told Plaintiff he was not free to leave the dorm. (*Id.*) If Plaintiff had not complied with directives to not leave the 5-Dog Run or the building, an Incident Command System (ICS) would have been activated. (*Id.* at 21.) At Plaintiff's March 8, 2018 disciplinary hearing, CO III Defeo told Plaintiff he had spoken to Thompson, Knight and another sergeant and "they all agreed that Defendant Loreto's conduct was unprofessional [and] done to provoke" Plaintiff. (*Id.* at 17.) But Defeo told Plaintiff he could not outright dismiss the disciplinary "because it was hard to determine who was telling the truth or lying in regards to whether a directive was given or not." (*Id.*)

## 2. Discussion

Plaintiff alleges in Count Two that Defendant Loreto retaliated against him for filing an informal complaint against Loreto for failing to provide a court-ordered telephone call for Plaintiff and then searching Plaintiff's cell and issuing an unfounded disciplinary infraction against Plaintiff.

Plaintiff has failed to show that he engaged in any protected conduct prior to Loreto searching his cell or issuing him a disciplinary ticket. Thus, Plaintiff cannot show that Loreto took adverse action against him because of his protected conduct. While Plaintiff claims the cell search was in retaliation for Plaintiff filing an Informal Complaint against Loreto, Plaintiff did not file the Informal Complaint until after the cell search and after Loreto issued the disciplinary ticket. The fact that the parties dispute whether Loreto issued any verbal directives to Plaintiff does not change this analysis. Because Plaintiff has failed to show that his protected conduct was a substantial or motivating factor behind Loreto's conduct, his retaliation claim against Loreto fails and the Court will grant summary judgment to Defendant Loreto as to the retaliation claim in Count Two.

### C.     Count Four (Defendant Garcia)

#### 1.     Relevant Facts

On July 12, 2018, Plaintiff went to the office of Defendant Garcia for a scheduled legal call; to complete the call, Plaintiff needed to move to a nearby room. (Doc. 103 ¶ 25.) Unrelated to the legal call, Garcia told Plaintiff that some property he had requested could not be located by the unit's property officer, and Plaintiff became upset and insisted that the property issue be resolved immediately. (*Id*. ¶ 26.) Garcia directed Plaintiff to leave her office but he refused three clear commands to leave, sat in a chair in the office, and insisted that he would not leave until Garcia activated an ICS, which Garcia did. (*Id*. ¶ 27.) Responding officers removed Plaintiff from the office and Garcia wrote disciplinary report 18-A08-0525, citing Plaintiff for a 10B violation for disorderly conduct, a major violation. (Doc. 103 ¶¶ 24, 28.) Plaintiff was convicted of the 10B charge for disorderly conduct and his conviction was upheld at all appeal levels, resulting in the loss of earned release credits. (*Id*. ¶ 29.)

According to Plaintiff's version of events, on July 9, 2018, Defendant Garcia stopped at Plaintiff's cell front, and Plaintiff asked Garcia about his legal property and explained that he had already spoken to Sergeant Harris on July 5 and sent Harris an inmate letter, but had not received a response, and that he had legal deadlines approaching. (Doc.

127 at 52.)  Garcia instructed Plaintiff to send her an inmate letter and Plaintiff sent an inmate letter that same day.  (*Id*. at 53.)

On July 12, 2018, Plaintiff was taken to Garcia's office for a legal call.  (*Id*.)  Garcia never told Plaintiff to go into the other office for his legal call, and she had Plaintiff sit in a chair in her office to wait for the call.  (*Id*.)  While waiting for the call, Plaintiff again asked Garcia about his legal property.  (*Id*.)  Although Garcia was present when Plaintiff's property was handed over to Sergeant Harris on July 5, Garcia claimed that Harris told her that Plaintiff's property was not at the unit.  (*Id*.)  Plaintiff told Garcia that he thought she was being dishonest, and Garcia said Plaintiff "was seeing things."  (*Id*. at 54.)  Plaintiff told Garcia "she could have been honest about not doing her job" and asked Garcia to call her supervisor or a sergeant, who would "do their job and assist in resolving the issue."  (*Id*.)  Garcia, "now angry, yelled, 'no! Get the fuck out of my office!'"  (*Id*.)  Plaintiff, "in a respectful tone, and never once becoming irate or aggressive," told Garcia he was not her child, that she needed to remain professional, and he again asked Garcia to call for a supervisor to aid in resolving the issue, but she denied Plaintiff's request again.  (*Id*. at 55.)  Because Garcia was being unprofessional and refused to call a supervisor, Plaintiff told her that the "only way that [he] would leave her office she would have to call a supervisor or activate a[n] ICS."  (*Id*.)  "At no time did [Plaintiff] demand that [his] property issue be resolved immediately," but Garcia did not check on his property and lied about it not being at the unit, which is why he requested a supervisor.  (*Id*.)

A minute or two later, Garcia activated an ICS and Plaintiff thanked her and got up and walked out of her office to meet the responding officials.  (*Id*.)  Plaintiff informed Sergeant Garret about his legal property and "the issue at hand," and he was later assured by CO IV Dison that he would receive his legal property in the next day or so.  (*Id*. at 55-56.)  Plaintiff was asked to return to his cell, and Sergeant Garrett told Plaintiff that Garcia had placed Plaintiff on report.  (*Id*. at 56.)  In her reports, Garcia falsely alleged that Plaintiff was non-compliant from 10:23 to 10:35 a.m., but no force was ever used.  (*Id*.)  Later that evening, Plaintiff "wrote out his Declaration."  (*Id*. at 56.)  Plaintiff cites to an

Inmate Letter dated July 12, 2018, in which he wrote that, as a result of the incident with Garcia, he "was locked down, issued a ticket for Disorderly Conduct despite CO III Garcia creating this unnecessary [illegible] of events by failing to do her job and being dishonest." (Doc. 127-1 at 47-48.) (*Id.* at 48.)

## 2. Discussion

Plaintiff alleges in Count Four that Garcia retaliated against him by issuing unfounded infractions after Plaintiff refused to leave Garcia's office and for filing an informal complaint against Garcia for breaking ADCRR's policy on employee professionalism, ethics, and conduct.

Plaintiff has failed to show that he engaged in any protected conduct of which Garcia was aware prior to Garcia issuing him a disciplinary ticket. Thus, Plaintiff cannot show that Garcia took adverse action against him because of his protected conduct. In fact, Plaintiff invited the adverse action by telling Garcia he would not leave her office unless she called a supervisor or activated an ICS. Because Plaintiff has failed to show that his protected conduct was a substantial or motivating factor behind Garcia's conduct, his retaliation claim against Garcia fails, and the Court will grant summary judgment to Garcia as to the retaliation claim against her in Count Four.

## IV. Due Process (Count Four)

Plaintiff alleges in Count Four that Defendant Garcia failed to provide him with notice of the maximum custody packet and right to appeal, in violation of his due process rights, and that Garcia falsified the document by alleging that Plaintiff refused to sign his max packet notice of hearing on two separate occasions.

### A. Relevant Facts[6]

#### 1. Max Custody Notice and Hearing

Disciplinary convictions increase a prisoner's custody and risk scores, which are used to determine a prisoner's custody level housing. (Doc. 103 ¶ 30.) Plaintiff's

---

[6] Because Plaintiff disputes many of Defendants' facts, the Court will set forth the parties' versions of events separately.

disciplinary convictions resulted in raised custody and risk scores; the frequency and severity of disciplinary violations by Plaintiff has resulted in him scoring as a maximum custody prisoner nearly nonstop since April 2015.  (*Id.* ¶ 31.)  ADCRR administrators have discretion to place a prisoner at a different custody level than the prisoner's scores would indicate, which is called an "override."  (*Id.*)  Despite his maximum custody scores, Plaintiff had resided on Close custody units (a lower custody level) most of the time since 2015.  (*Id.* ¶ 33.)

When a prisoner is being considered for maximum custody placement, he is given notice and an opportunity to be heard in the form of a "max packet."  (*Id.* ¶ 34.)  The max packet contains a written explanation of the grounds for potential max custody placement, notice of when a hearing will take place, and instructions on procedural issues such as presenting witnesses and taking an appeal.  (*Id.*)  Plaintiff has received at least five max packets while in ADCRR custody.  (*Id.* ¶ 35.)

As a result of Plaintiff's 10B disciplinary violation in July 2018, he was set to be "maxed-out" and moved from Close custody to Maximum custody in November 2018.  (*Id.* ¶ 36.)  In November 2018, CO III Rothlisberger was Plaintiff's assigned CO III, and Rothlisberger was responsible for giving Plaintiff the max packet, the 48-hours' notice, and hearing to contest the move.  (*Id.* ¶ 38.)  Defendant Garcia, though, typed up the November 2018 max packet for Rothlisberger, and it was not unusual for Garcia and Rothlisberger to assist each other with their workloads in this way.  (*Id.* ¶ 39.)  CO III Rothlisberger served the max packet and later conducted the hearing.  (*Id.* ¶ 40.)  Rothlisberger actually served two max packets on Plaintiff in November 2018, but the first packet was returned to Rothlisberger because Central Office had detected a procedural defect in that it was served less than 48 hours before the scheduled hearing.  (*Id.* ¶ 41.)  Rothlisberger re-served Plaintiff with the max packet on November 14, 2018 and re-scheduled the hearing to November 20, 2018 to comply with the 48-hour notice requirement.  (*Id.* ¶ 42.)  Plaintiff refused to sign the documents to acknowledge receipt of them and, per policy, Defendant Garcia joined Rothlisberger in signing the forms to

document that Plaintiff refused to sign.  (*Id.* ¶ 43.)  Garcia did not have first-hand knowledge that Plaintiff had refused to sign but learned from Rothlisberger that Plaintiff had refused to sign.  (*Id.*)

Defendant Garcia did not serve Plaintiff with a max packet, and she did not hold a hearing; serving the max packet and holding a hearing were not Garcia's responsibility.  (*Id.* ¶ 44.)  Garcia was not present when Rothlisberger served the max packet, she was not present when Rothlisberger conducted the hearing, and she was not obligated by policy to be present for either event.  (*Id.* ¶ 45.)

The "Notice of Hearing and Inmate Rights (Proposed Maximum Custody Placement)" dated November 14, 2018 has the names "Garcia/Rothlisberger" under the space reserved for staff name and it has two illegible signatures.  (Doc. 103-2 at 19-20.)  The Notice shows a hearing date of November 20, 2018.  (*Id.* at 19.)  The form for "Maximum Custody Placement Recommendation/Approval" indicates that Plaintiff and Garcia were present at the hearing on November 20, 2018.  (*Id.* at 22.)  Garcia states in her Declaration that she wrote her name as being present for the hearing while preparing the max packet several days before the hearing and before she knew that Rothlisberger would conduct the hearing.  (Doc. 103-2 at 6 ¶ 30.)  Thus, Garcia says "it is inaccurate," and she was not present at the hearing.  (*Id.*)  The form states that Plaintiff's "recent and past behavior shows the need to be managed at a higher custody.  Recommend Max Custody."  (*Id.* at 22.)  The form indicates that Plaintiff was not provided a copy of the Hearing Findings or Notice of Appeal for Maximum Custody Placement.  (*Id.* at 23.)  The form further indicates that Plaintiff was notified of the appeal process and did not waive his right to appeal his placement in Maximum Custody.  (*Id.*)  The form says Plaintiff "refused to sign" and "Garcia/Rothlisberger" is printed under "Classification Officer," followed by what appears to be two illegible signatures.  (*See id.*)  Garcia asserts that she signed this document when Rothlisberger returned from conducting the hearing and reported to Garcia that Plaintiff had refused to sign, and so, per policy, she signed the document along with Rothlisberger.  (Doc. 103-2 at 7 ¶ 33.)  Assistant Deputy Warden Ron Schmidt signed the

form on November 23, 2018, stating "disorderly conduct tickets were displays of verbal aggressions towards staff.  Inmate should stay in higher custody." (*Id*. at 23.)  Warden S. Morris signed the form on November 26, 2018, stating, "Max custody due to discipline history." (*Id*.)  A Classification Administrator signed the form on November 30, 2018 with the comment "Max," but the person's printed name and signature are illegible. (*Id*.)

Plaintiff's max packet was forwarded through the chain of command with each level recommending movement into max custody.   (Doc. 103 ¶ 46.)   Central Office Classification makes the final decision on max custody placements, and it approved max custody for Plaintiff. (*Id*.)  Plaintiff was moved into maximum custody on December 6, 2018. (*Id.* ¶ 47.)

Plaintiff disputes Defendants' evidence, asserting that he never received either of the two notices of hearing or maximum custody placement forms between November 12 and November 21, 2018. (Doc. 127 at 86-87.)  Plaintiff was never at the hearing and never had the chance to sign the Maximum Custody Placement Recommendation/Approval form of November 20, 2018. (*Id*. at 88.)  Plaintiff did not know about the max packet or that his due process rights were violated until December 6, 2018, when he learned he had been maxed out and a max packet had been processed. (*Id*. at 93.)  That was when six or seven officials came to Plaintiff's pod and "rolled [Plaintiff] up." (*Id*. at 76.)  Plaintiff did not find out that the first max packet was returned until he spoke with CO IV Roberts on December 7, 2018, after he had been maxed out. (*Id*. at 87.)

Plaintiff asserts that Rothlisberger aided Garcia in denying Plaintiff his Notice of Hearing and Plaintiff appears to assert that he was denied due process in retaliation for having submitted many informal complaints and grievances, which were often unprocessed. (*See* Doc. 127 at 70-76.)  Plaintiff's last "face to face" with Rothlisberger was on November 10, 2018, when Rothlisberger told Plaintiff he needed more time to resolve Plaintiff's informal complaints; after that, Rothlisberger started to avoid Plaintiff and ignored Plaintiff's request to be seen. (*Id*. at 75.)

. . . .

## 2.     Max Custody Appeals Process

A prisoner can appeal a maximum custody placement by submitting a written appeal directly to Central Office within 15 days of the maximum custody placement decision. (Doc. 103 ¶ 48.)  If service of the placement decision upon the prisoner is not documented, then an appeal is deemed timely if submitted within 15 days of the prisoner's move to a maximum custody placement.  (*Id.* ¶ 49.)  The appeals process is explained in Department Order (DO) 801, which prisoners can access in their unit's resource center.  (*Id.* ¶ 50.)  On appeal, Central Office can overrule the maximum custody placement, affirm it, or take other appropriate actions, such as calling for additional investigation or a new hearing.  (*Id.* ¶ 51.)

Under DO 801, the Notice of Hearing must be presented to the prisoner at least 48 hours in advance of the hearing, unless the prisoner waives this notice period.  (Doc. 103-2 at 51 ¶ 19 (citing DO 801 § 10.1.1).)  After a hearing, the Warden or designee will forward a recommendation to the Central Office Classification Administrator or designee, who has final authority to decide whether to place the prisoner in maximum custody.  (*Id.* ¶ 20 (citing DO 801 § 10.3-10.4).)  When a prisoner is approved for maximum custody placement by Central Office, he is notified of the decision and provided a Notice of Appeal form.  (*Id.* ¶ 21 (citing DO 801 § 10.5).)  A prisoner may be informed verbally of his approval to maximum custody, and in that case, his assigned CO III shall make the notification and enter a comment into the AIMS system to document the notification and whether a Notice of Appeal form was served.  (*Id.* ¶ 22 (citing DO 801 § 10.5.1).)  Alternately, a prisoner may be notified of the final decision when he receives the completed copy of the Maximum Custody Placement Recommendation/Approval form.  (*Id.* ¶ 23 (citing DO 801 § 10.5.2).)  In that case, the prisoner must contact his assigned CO III to request a Notice of Appeal form.  (*Id.*)  If the prisoner wants to appeal, he must submit a written appeal to the Offender Services Administrator at Central Office Classification within 15 days following the receipt of the notice of the decision from the Central Office

Classification Administrator or designee.  (*Id*. ¶ 24 (citing DO 801 § 11.2).)[7]  The appeal must be limited to the issue of maximum custody placement but may address related issues such as due process and adequacy of proof.  (*Id*. ¶ 25.)

According to Defendants, Plaintiff did not appeal his November 2018 maximum custody placement.  (Doc. 103 ¶ 52.)  The AIMS system does not indicate when or how Plaintiff was given notice of the final decision of Central Office to place him in maximum custody.  (Doc. 103-2 at 55 ¶ 42.)  Therefore, Plaintiff had 15 days from the date he was placed into maximum custody—until December 6, 2018—to appeal the decision.  (*Id*. ¶¶ 43-44.)  According to Stacey Crabtree, ADCRR's Administrator of the Offender Services Bureau, Plaintiff did not appeal the decision to place him in maximum custody by sending a "notice of Appeal form, an inmate letter form, or any form of written correspondence to Central Office classification within 15 days of his maximum custody placement on December 6, 2018."  (*Id*. ¶ 47.)

DO 802 is ADCRR's Inmate Grievance Procedure and can be used to grieve all aspects of institutional life or conditions of confinement, but DO 802 cannot be used as a substitute appeal process for actions that have their own appeals process, such as disciplinary and classification issues.  (Doc. 103 ¶¶ 53-54.)  Plaintiff did submit several documents under DO 802 complaining about or referencing a lack of notice of maximum custody placement, but each of these documents was screened out and unprocessed for non-compliance with ADCRR's policies.  (Doc. 103 ¶¶ 55-56.)

Plaintiff wrote an Inmate Letter dated December 7, 2018 to Deputy Warden (DW) of Operations Morris, in which he complained about being denied due process during his maximum custody placement.  (Doc. 103 ¶ 60.)  Plaintiff wrote that he did not receive notice of a max packet, that CO III Rothlisberger lied that Plaintiff refused to sign the max packet, that Plaintiff was denied the right to appeal or provide his reasons for why the max packet should not go through, and that he knows "it's all retaliation for attempting to use

---

[7] DO 801 § 11.2 does not state that any particular form must be used and only says that "[t]he inmate shall submit a written appeal to Offender Services Administrators within 15 days . . . ."  (Doc. 103-1 at 23.)

1   the grievance system" and for filing a lawsuit in federal court.  (Doc. 103-2 at 43.)  Deputy

2   Warden Kimble responded on December 28, 2018, that both CO IIIs involved in Plaintiff's

3   maximum custody placement hearing were interviewed and both stated that Plaintiff was

4   notified of the proposed hearing and that Plaintiff refused to sign the form acknowledging

5   the notification and they both signed the form as witnesses to Plaintiff refusing to sign.  (*Id.*

6   at 44.)  Kimble noted that the CO IIIs did this twice because the first notice was within 48

7   hours of the hearing.  (*Id.*)  Kimble concluded his response by stating, "[i]n reviewing the

8   maximum custody hearing packet, the recorded comments in AIMS and interviews with

9   the CO IIIs I find no violation of due process.  In the future, these types of issues may be

10  addressed through your unit administration to allow them the opportunity to respond to

11  and/or resolve your concerns." (*Id.*)  Defendants assert that Plaintiff's letter did not exhaust

12  his available administrative remedies because it was not the correct way to appeal a

13  maximum custody placement issue.  (Doc. 103 ¶ 60.)  Stacy Crabtree asserts that an inmate

14  letter to unit administration or complex administration is not the correct way to appeal a

15  maximum custody placement and, although DW Kimble chose to investigate the complaint

16  that was brought to him, neither Plaintiff's December 7, 2018 letter nor DW Kimble's

17  response "did or could have exhausted [Plaintiff's] available administrative remedies

18  through DO 801 § 11.0." (Doc. 103-2 at 29 ¶ 20.)

19      Plaintiff also submitted an Inmate Letter dated December 10, 2018 complaining of

20  a lack of notice of his maximum custody placement, but the form he used was for inmate

21  grievances under DO 802 "and was not the correct way to appeal a maximum custody

22  placement." (Doc. 103-2 at 28 ¶ 16.)  Plaintiff's Inmate Letter was returned to him that

23  same day unprocessed with the notation that "classification has its own appeal process."

24  (*Id.*; Doc. 103-2 at 35.)  Defendants assert that Plaintiff could have timely appealed his

25  maximum custody placement at that time by submitting a written appeal to Central Office

26  classification by December 21, 2018, which was 15 days after his movement into maximum

27  custody.  (*Id.* ¶ 57.)

28

Plaintiff wrote an Inmate Grievance dated January 3, 2019, stating that he was denied due process during the max packet proceeding, that neither Rothlisberger nor Garcia gave him the max packet, that he never refused to sign the max packet or appeal, and this was "retaliation by these officials." (Doc. 103-2 at 37.)  Plaintiff asked for the CO IIIs to be fired and for his max placement to be reversed.  (*Id*.)  The response dated January 8, 2019 stated that "classification has its own appeal process." (*Id*.)  Plaintiff wrote another grievance dated January 3, 2019 about the failure to inventory his property on December 6, 2018, that he was placed in a dirty cell, officials had failed to provide cleaning supplies, had failed to fix the hot water and light in his cell, and had held his property and not provided adequate hygiene supplies.  (*Id*. at 39.)  That grievance was unprocessed with a notation of "multiple issues." (*Id*.)  Plaintiff filed a grievance on January 26, 2019 about Rothlisberger and Garcia conspiring to deny Plaintiff due process during the max packet process by denying Plaintiff notice, right to be at the hearing, and the right to appeal.  (*Id*. at 41.)  This grievance was unprocessed with a notation "classification has its own appeal process." (*Id*.)

Plaintiff also wrote Inmate Letters dated January 17, 2019 to "Stacey Bracker" and "Michael Duncan," who were purportedly members of "classification-administration," in which he complained of various issues such as property claims and claims against staff. (Doc. 103 ¶ 58.)  Those letters were returned to Plaintiff's unit for resolution because property and grievance issues are not properly addressed to Central Office classification. (*Id*. ¶ 59.)

Plaintiff asserts that when he spoke to CO IV Roberts on December 7, 2018 about being maxed-out, he told Roberts he "wanted a chance to appeal" but "Roberts denied [Plaintiff] the form." (Doc. 127 at 17.)  Plaintiff was ignored by the CO IIs between November 10, 2018 and December 21, 2018, leaving him "with no remedy under DO 801 absent notification of a final decision." (Doc. 127 at 94.)  Plaintiff exhausted the available administrative remedies to the best of his ability after being denied (1) a notice of max placement hearing, (2) a hearing on the proposed max custody placement, (3) a notice of

appeal form, and (4) notice of a final decision from Central Office pursuant to DO 801.10 § 1.5.2.  (*Id*.)  Plaintiff's only option was to grieve the issue under the DO 802 grievance process, but "this was also made unavailable by CO III Corillo/CO IV Roberts who "unprocessed" Plaintiff's "due process by retaliation claim."  (*Id*.)  At no time between December 10, 2018 and January 26, 2019, did CO III Corrillo or CO IV Roberts instruct Plaintiff on how to appeal his maximum custody placement, and the response to Plaintiff's Inmate Letter that "classification had its own appeal process" did not contain any instructions.  (*Id*. at 94-95.)

In May 2019, Plaintiff was reclassified back down to close custody and after that, the ASPC-Eyman, SMU 1 Administration Staff "were relieved of their positions at the unit (i.e. Def. Garcia, CO III Rothlisberger, DW Kimble, ADW Schmidt, CO IV Roberts)." (Doc. 127 at 95.)

## B. Discussion

Defendants argue that Plaintiff failed to exhaust available administrative remedies regarding his maximum custody placement, that he received due process because he was given 48-hours' notice of the hearing and a right to appeal, that Defendant Garcia was never responsible for affording Plaintiff due process, and Garcia is entitled to qualified immunity.  (Doc. 102.)

### 1. Exhaustion

Under the PLRA, a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).  The exhaustion question should be decided as early as possible in the proceeding. *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Id.* at 1172; *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a). If a court grants summary judgment on nonexhaustion grounds, dismissal is without prejudice. *See Lira v. Herrera*, 427 F.3d 1164, 1170 (9th Cir. 2005); *McKinney v. Carey*, 311 F.3d 1198, 1200–01 (9th Cir. 2002).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted administrative remedies, that administrative remedies were not available, or that the failure to exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.* at 1171.

Defendants argue that Plaintiff was aware of the appeals process for maximum custody placement because had had received "numerous max packets throughout his years in ADCRR custody." (Doc. 102 at 12.) Defendants argue that DO 801 spells out the appeals process and all Plaintiff needed to do was send a written appeal to the Offender Services Administrator within 15 days of the decision to place him in maximum custody or within 15 days of his actual placement if he did not receive notice. (*Id.*) Defendants contend that Plaintiff was specifically instructed that "classification has its own appeal process" when he tried to grieve the issue of his maximum custody placement under DO 802. (*Id.* at 12-13.) And Defendants argue that Plaintiff's letter to the Deputy Warden of

Operations was not the right way to appeal a maximum custody placement and Plaintiff must have known this because he filed an improper informal complaint after writing that letter. (*Id.* at 14.)

Defendants' argument is without merit. First, the Court must accept as true that Plaintiff never received the notice of the max custody hearing or the results of the hearing. Second, although Defendants assert that Plaintiff received max packets in the past, they have not shown that Plaintiff ever appealed a max custody decision such that he had knowledge from past experience of how to do so. Nor have they shown that Plaintiff knew about DO 801's appeals process or that anyone ever informed him of DO 801's requirements. Moreover, when Plaintiff asked CO IV Roberts for a form to appeal his maximum custody placement, Roberts did not give him one. Therefore, Defendants have not met their initial burden of showing that there was an available administrative remedy for Plaintiff to appeal his maximum custody placement through DO 801.

In addition, Defendants' own evidence shows that Plaintiff was never given a copy of the Hearing Findings or Notice of Appeal for Maximum Custody Placement, and this is confirmed by ADCRR's AIMS system. (Doc. 103-2 at 55 ¶ 42.) And Plaintiff presents evidence that CO IV Roberts denied him a form to appeal his placement. Therefore, Plaintiff resorted to filing a timely Inmate Letter with the Deputy Warden of Operations on December 7, 2018, in which he complained about the lack of due process in the max custody proceedings, that he never received the max packet, and he was denied the right to appeal or present his reasons why the max packet should not go through. Deputy Warden Kimble responded to the merits of Plaintiff's letter, stating that he investigated the claims, reviewed the maximum custody hearing packet, the recorded comments in AIMS and interviews with the CO IIIs and found no due process violations. Kimble concluded by stating that "in the future, these types of issues may be addressed through your unit administration to allow them the opportunity to respond to and/or resolve your concerns." (Doc. 103-2 at 44.) Kimble did not tell Plaintiff that his letter was improper, that there was a different process for appealing the max custody decision, or that this letter did not serve

as Plaintiff's appeal, and, in fact, Kimble's letter informs Plaintiff that if he has similar issues in the future, i.e., being denied due process in max custody proceedings, he should address the issue to his "unit administration."  Kimble did not inform Plaintiff that he needed to file a separate appeal to the Offender Services Administrator.

Accordingly, Defendants have failed to meet their initial burden of showing that there was an administrative remedy available to Plaintiff or that Plaintiff failed to exhaust the available administrative remedy, and the Court will deny summary judgment to Defendant Garcia based on exhaustion.

### 2. Due Process

In analyzing a due process claim, the Court must first decide whether Plaintiff was entitled to any process, and if so, whether he was denied any constitutionally required procedural safeguard.  Liberty interests that entitle an inmate to due process are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).

To determine whether an inmate is entitled to the procedural protections afforded by the Due Process Clause, the Court must look to the particular restrictions imposed and ask whether they "'present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.'"  *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995) (quoting *Sandin*, 515 U.S. at 486).  "Atypicality" requires not merely an empirical comparison but turns on the importance of the right taken away from the prisoner.  *See Carlo v. City of Chino*, 105 F.3d 493, 499 (9th Cir. 1997).  To determine whether the sanctions are atypical and a significant hardship, courts look to the prisoner's conditions of confinement, the duration of the sanction, and whether the sanction will affect the duration of the prisoner's sentence.  *See Keenan v. Hall*, 83 F.3d 1083, 1088-89 (9th Cir. 1996).

It is well-settled that placement in maximum security segregation units implicates a liberty interest requiring due process protections. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). A prisoner may be deprived of his liberty interest as long as he is accorded the proper procedural protections. It is also well-settled that, for the initial decision to place a prisoner in maximum custody, due process is generally satisfied if the prisoner is given written notice of the factual basis for the placement and an opportunity to be heard. *Id.* at 225-27; *Hewitt v. Helms*, 459 U.S. 460, 476 (1983), *overruled in part on other grounds by Sandin*, 515 U.S. 472.

Defendants argue that Plaintiff received due process because he was given 48-hours' notice of the hearing, when only 24 hours is required for constitutional due process. (Doc. 102 at 14 (citing *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974) (holding that 24-hours' "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense").) Defendants also argue that Plaintiff could have appealed the decision after the hearing but declined to do so. (*Id.*)

The only evidence Defendants present that Plaintiff received the notice of hearing is Garcia's hearsay statement that Rothlisberger told Garcia that Plaintiff refused to sign the notice. Defendants do not present a declaration from Rothlisberger that he served the notice on Plaintiff and Plaintiff refused to sign the notice. Moreover, Plaintiff presents evidence that he never received the notice or max packet and only found out about it when he was "rolled up" and moved to max custody on December 6, 2018. This creates a genuine dispute of material fact whether Plaintiff received any notice of the max custody hearing or of his rights to appeal.

Defendants also argue that because CO III Rothlisberger replaced Defendant Garcia as Plaintiff's case manager in August 2018, any failure to provide the proper notice "is on Rothlisberger" and Garcia "can't be held responsible for the failings of her coworker, especially since she had no knowledge of the alleged failures of due process." (Doc. 102 at 15 (citing *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).)

1    Defendants reliance on *Harrington* is misplaced.  In *Harrington*, the Ninth Circuit

2    observed that "[c]onstructive notice does not suffice to provide the requisite knowledge"

3    of a substantial risk of serious harm to prisoner health and safety under the Eighth

4    Amendment.  785 F.3d at 1304.  *Harrington* was not addressing a prisoner's due process

5    rights under the Fourteenth Amendment and is thus not helpful in this instance.  Defendant

6    Garcia signed the max packet affirming that Plaintiff refused to sign the packet, the

7    document from the hearing indicates that Garcia was present at the hearing, and Garcia

8    signed the hearing form affirming that Plaintiff refused to sign the form.  (Doc. 103-2 at

9    20, 22.)  The hearing form does not say that Rothlisberger was present at the hearing.  (*See*

10   *id*. at 22.)  Garcia now attests in her Declaration that she only relied on Rothlisberger's

11   averments that Plaintiff refused to sign the forms, and she says the form is wrong where it

12   says she was present at the hearing because she prepared the form ahead of the hearing.

13   But Garcia does not explain why a corrected form was not prepared showing who was

14   actually present at the hearing, and again, Defendants do not provide a Declaration from

15   Rothlisberger corroborating Garcia's version or, if Rothlisberger was the hearing officer,

16   what happened at the hearing and whether Plaintiff was actually present at the hearing, as

17   the form says he was but Plaintiff disputes.  Moreover, Defendants do not present any

18   evidence or authority supporting that a CO's signature attesting to one thing on a prison

19   form can be disavowed nearly two years later in a Declaration stating that the CO had no

20   personal knowledge about the events.  The only evidence before the Court of what occurred

21   at the time of the notice and hearing are Garcia's and Rothlisberger's signatures on the

22   forms stating that Plaintiff refused to sign and that Garcia was at the hearing.  The inference

23   from these documents is that Garcia was present for those events.  *See Soremekun*, 509

24   F.3d at 984 (the Court must draw all inferences in the light most favorable to the

25   nonmoving party).  Whether or not Garcia was actually present for either of those events

26   becomes a credibility issue which the Court cannot resolve at summary judgment.  *See id*.

27   ("at the summary judgment stage, the court does not make credibility determinations or

28

1   weigh conflicting evidence").   Accordingly, there is a genuine issue of material fact

2   whether Garcia denied Plaintiff his due process rights.

3           **3.**      **Qualified Immunity**

4           Government officials are entitled to qualified immunity from civil damages unless

5   their conduct violates "clearly established statutory or constitutional rights of which a

6   reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

7   Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or

8   constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at

9   the time.'" *District of Columbia v. Wesby,* — U.S. —, 138 S. Ct. 577, 589 (2018) (quoting

10  *Reichle v. Howards,* 566 U.S. 658, 664, (2012)).

11          For a right to be clearly established there does not have to be a case directly on

12  point; however, "'existing precedent must have placed the statutory or constitutional

13  question beyond debate.'" *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (quoting

14  *Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 308 (2017)).  Accordingly, a right is clearly

15  established when case law has been "earlier developed in such a concrete and factually

16  defined context to make it obvious to all reasonable government actors, in the defendant's

17  place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868

18  F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).  To determine whether

19  qualified immunity applies, the court must first identify the federal or constitutional right

20  at issue; then it must attempt to "identify a case where an officer acting under similar

21  circumstances as [the defendant] was held to have violated" that right.  *Id*.  If there is no

22  such case, then the right was not clearly established, and the officer is protected from suit.

23  *See id.* at 1117-18.  "This is not to say that an official action is protected by qualified

24  immunity unless the very action in question has previously been held unlawful, but it is to

25  say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*,

26  536 U.S. 730, 739 (2002) (internal citations omitted).

27          Because the Court has already determined that there is a question of fact whether

28  Garcia violated Plaintiff's due process rights, the qualified immunity analysis turns on

whether the right at issue in this case was clearly established at the time Plaintiff's claim arose.

Defendants argue that Plaintiff cannot establish that Garcia's specific conduct here violated any clearly established law.  (Doc. 102 at 17.)  Defendants contend that, at best, Plaintiff can only "insinuate that Garcia signed the max packet refused-to-sign form without attempting to verify that Rothlisberger actually served the max packet," but it is not clearly established law "that a secondary witness to an inmate's refusal to sign must have first-hand knowledge of that refusal, as opposed to relying on the report of another officer."  (*Id*.)

Defendants' definition of the right at issue hinges on the Court accepting Defendant Garcia's averments in her Declaration that she was not present when the max packet was purportedly delivered to Plaintiff and she was not at the hearing.  But the Court has already found that this involves a credibility determination that cannot be decided at summary judgment.  A reasonable jury could find based on the evidence that Garcia was involved in the deprivation of Plaintiff's due process rights.  In 2018, it was clearly established that a prisoner being considered for maximum custody placement must be given written notice of the factual basis for the placement at least 24 hours in advance and an opportunity to be heard.  *Wilkinson*, 545 U.S. at 224.  Here, it is disputed that Plaintiff ever received such notice.  Therefore, Defendant Garcia is not entitled to qualified immunity.  *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

Because there are disputed issues of material fact whether Defendant Garcia violated Plaintiff's due process rights, the Court will deny summary judgment to Defendant Garcia as to the due process claim in Count Four.

. . . .

. . . .

. . . .

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 102) and the Motion is **granted in part and denied in part** as follows:

       (a)    The Motion is **granted** as to the First Amendment retaliation claims against Defendants Loreto, Wood, and Garcia, and those claims and Defendants Loreto and Wood are **dismissed from this action with prejudice**;

       (b)    The Motion is **denied** as to the Fourteenth Amendment due process claim against Defendant Garcia in Count Four.

(2)    This action is referred to Magistrate Judge Camille D. Bibles to conduct a settlement conference as to Plaintiff's remaining claim against Defendant Garcia.

(3)    Defense counsel shall arrange to jointly call Magistrate Judge Bible's chambers at (928) 774-2566 and/or email at bibles_chambers@azd.uscourts.gov, within 14 days to schedule a date for the settlement conference.

Dated this 18th day of February, 2021.

Michael T. Liburdi
United States District Judge